AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
04/02/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ____DVE____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
04/02/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ____JD____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

United States of America

v.

VICTOR FERNANDO ESPINOZA PONCE,

Defendant.

Case No.  8:25-mj-00247-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 1, 2025, in the county of Orange within the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 (a) (1), (b) (1) (A) (viii) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Troy Baginski
*Complainant's signature*

Troy Baginski, Special Agent, (DEA)
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 2, 2025

*Karen E. Scott*
*Judge's signature*

City and state:  Santa Ana, California

Hon. Karen E. Scott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kristin Spencer (714) 338-3531

**AFFIDAVIT**

I, Troy H. Baginski, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with DEA, and have been so employed since August 2024. I am currently assigned to the Los Angeles Field Division, Orange County District Office. During the course of my employment with the DEA, I have received specialized training concerning violations of the Controlled Substances Act, contained within Title 21 of the United States Code, including during training at the DEA Training Academy in Quantico, Virginia. My training included specialized drug trafficking investigative matters, including, but not limited to, drug interdiction, money laundering techniques and schemes, smuggling, financial investigations, controlled substance identification, physical and electronic surveillance, confidential source management, undercover operations, and the investigation of individuals and organizations involved in the smuggling, cultivation, manufacturing, and trafficking of controlled substances.

2. I have spoken with individuals arrested for drug-related crimes as well as, confidential informants working with law enforcement about the possession, sale, and distribution of

illegal substances. I have also discussed these matters with other federal agents and law enforcement officers. I am familiar with street terms involving controlled substances, including for methods of ingestion, packaging, purchasing, selling, transporting, and manufacturing controlled substances. I know that subjects involved in the possession and sale of controlled substances often hide controlled substances in their homes, on their person, and in their vehicles.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint against VICTOR FERNANDO ESPINOZA PONCE ("ESPINOZA") for a violation of Title 21, United States Code Section 841(a)(1),(b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

4. Unless otherwise stated, the facts set forth in this affidavit are based upon my personal observations; my training and experience; oral and written reports about this investigation; and physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly. Unless otherwise noted, when I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law

enforcement officer, either directly or in a written report. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are on or about those indicated.

### III. STATEMENT OF PROBABLE CAUSE

**A.  BPA Richardson Identified SUBJECT VEHICLE**

5.  On April 1, 2025 United States Border Patrol ("BPA") Brandon Richardson was sitting in the driver's seat of a marked Border Patrol unit that was parked perpendicular to the northbound lanes at approximately mile marker 67 of the Interstate 5 freeway in the area of the San Clemente Border Patrol station. At approximately 6:00 p.m., BPA Richardson saw a silver Ford Figo (the "SUBJECT VEHICLE") with Mexican License plate number GEC438D traveling northbound in the number two lane[1] of the freeway.

6.  BPA Richardson noticed that when the SUBJECT VEHICLE came close to his patrol vehicle, the driver of the SUBJECT

---

[1] The number one lane of the freeway is the lane closest to the center median, the number two lane is to the left of the number one lane, and so on.

3

VEHICLE activated the brakes and quickly decelerated from a speed equal to the flow of traffic (which is typically 70 to 80 miles per hour) to a speed of approximately 60 miles per hour. Based on the sudden stop, BPA Richardson drove his patrol vehicle onto the 5 freeway in order to continue to observe the SUBJECT VEHICLE. While following the SUBJECT VEHICLE, BPA Richardson also noticed that the driver side brake light of the SUBJECT VEHICLE was not functioning. BPA Richardson also saw the SUBJECT VEHICLE had switched lanes to the number one lane and appeared to be swerving in the lane.

7. As BPA Richardson was following the vehicle, he conducted a check for Department of Homeland Security ("DHS") records of the SUBJECT VEHICLE's Mexico license plate using his agency-issued laptop.

8. Based on DHS records, BPA Richardson determined that the SUBJECT VEHICLE had crossed the United States-Mexico border eight times between January 22, 2025 and April 1, 2025. The most recent crossing was through the San Ysidro Port of Entry at approximately 4:16 p.m. on April 1, 2025.

9. The DHS records included a photograph of the individual who was driving the vehicle at the time of the border crossing, who was identified as ESPINOZA. DHS records indicated that ESPINOZA had a valid B1/B2 Visa that allowed him to enter the United States, but had not been issued an I-94 form. Based

on conversations with Border Patrol Agents, I know that Mexican citizens who enter the United States without an I-94 are not permitted to travel in California further than 25 miles from the United-States Mexico border.[2]

10.  BPA Richardson brought his patrol vehicle adjacent to the SUBJECT vehicle in order to confirm that the driver of the SUBJECT VEHICLE matched the photograph of ESPINOZA.  BPA Richardson confirmed that ESPINONZA was the driver of the SUBJECT VEHICLE.

    **B.  Border Patrol Agents Stop the SUBJECT VEHICLE and Discover Suspected Narcotics in the Gas Tank**

11.  Because ESPINOZA was in an area of California where he was not authorized to be, BPA Richardson activated his vehicle's emergency lights and sirens to conduct a vehicle stop.  The SUBJECT VEHICLE came to a stop near Exit 73 of the Interstate 5 freeway in San Clemente, California, within Orange County.  Once the SUBJECT VEHICLE safely stopped, BPA Richardson exited his patrol vehicle and approached the passenger side of the SUBJECT VEHICLE.

12.  BPA Richardson asked ESPINOZA where he was coming from and where he was going. ESPINOZA stated he lived in Tijuana and

---

[2] The San Clemente Border Patrol station at mile marker 67 is approximately 67 miles from the San Ysidro Port of Entry.

was going to Los Angeles, California.[3] ESPINOZA did not know the address he was going to in Los Angeles and stated that he was going to call someone as soon as he got to Los Angeles.

    13.   BPA Richardson requested ESPINOZA's identification. ESPINOZA handed BPA Richardson a valid B1/B2 visa card. BPA Richardson noticed that ESPINOZA's hands were visibly shaking when he provided the visa card. BPA Richardson asked to see his I-94. ESPINOZA apologized and stated he did not have an I-94. BPA Richardson told ESPINOZA that he needed an I-94 to travel further than 25 miles north of the border. BPA Richardson again asked ESPINOZA where he was going and how long he was going to be there. ESPINOZA said he was going to go eat and said he would be in Los Angeles for two days. BPA Richardson again asked ESPINOZA for his destination address.  ESPINOZA stated that he did not know the precise address and had planned to call someone when he got closer to Los Angeles to receive the address.

    14.   BPA Richardson instructed ESPINOZA to turn off the engine and asked if he was the only one to drive the vehicle in Mexico and the United States. ESPINOZA stated that he was.  BPA Richardson asked ESPINOZA if everything in the car belonged to him, and ESPINOZA said that it did.

---

[3] All conversations between law enforcement and ESPINOZA were conducted in the Spanish language.  The English-language descriptions contained herein are not meant to be exact translations, but rather summaries based on the understanding of the law enforcement officers involved in the conversations.

15. While he was speaking with ESPINOZA, BPA Richardson noticed a strong smell of gasoline. Based on my training and experience, I know that it is common for individuals smuggling drugs over the border to conceal drugs in the vehicle's gas tank. This can cause damage to the gas tank that results in gasoline leaking from the tank and the smell of gasoline to emanate from that leak.

16. BPA Richardson asked ESPINOZA if he would consent to a search of the vehicle. ESPINOZA verbally consented to a search.

17. After receiving consent to search the SUBJECT VEHICLE, BPA Richardson entered the rear of the vehicle and lifted up the rear seat in order to inspect the gas tank. BPA Richardson noticed damage on the sending unit of the gasoline tank that was consistent with the tank having been opened.

18. BPA Richardson asked for consent to conduct a canine search of the vehicle. Again, ESPINOZA verbally consented. BPA Isidro Gaytan and canine partner Sago responded to BPA Richardson's vehicle stop.

19. BPA Gayton asked ESPINOZA if he had anything illegal in his vehicle. ESPINOZA said no. BPA Gaytan asked ESPINOZA if he could run a canine sniff of the exterior and interior of the vehicle. ESPINOZA responded yes. Canine partner Sago alerted to the rear seat of the vehicle. BPA Gaytan informed BPA Richardson

of the positive alert.

20. Following the positive canine alert, BPA Richardson removed the sending unit from the gas tank. Inside the gas tank, BPA Richardson found several cellophane wrapped bundles consistent with smuggled narcotics. BPA Richardson placed ESPINOZA under arrest at approximately 6:26 p.m. ESPINOZA, the SUBJECT VEHICLE, and the suspected narcotics were transported back to the San Clemente Border Patrol Station for processing.

21. At the Border Patrol Station, BPAs removed a total of 21 packages from the vehicle's gas tank. The contents of one of the packages was tested with a TruNarc field testing kit and came back positive for methamphetamine. BPAs weighed the packages and determined that they weighed approximately 10.5 kilograms, including packaging.

    **C.    DEA SAs Interview ESPINOZA and ESPINOZA Confirms that He Knew the SUBJECT VEHICLE Contained Contraband**

22. At approximately 10:25 p.m., I, along with DEA SA Ernesto Aguilar and BPA Eric Mendez interviewed ESPINOZA at the San Clemente Border Patrol Station. Prior to starting the interview, we identified ourselves as members of law enforcement and read ESPINOZA his Miranda rights from a department-issued form. ESPINOZA was also provided with an I-214 Notice of Rights form in the Spanish language, which he signed. ESPINOZA agreed to speak with law enforcement.

23. ESPINOZA stated that he had been living in Tijuana,

Mexico for approximately eight months. ESPINOZA stated that an individual identified as "Louie" had contacted him in Tijuana and asked ESPINOZA to help "cross a load" to Los Angeles, California. ESPINOZA agreed and provided the keys to the SUBJECT VEHICLE, which he owned, to an unknown individual. A few hours later, the unknown individual returned in the SUBJECT VEHICLE and gave the keys back to ESPINOZA.

24. ESPINOZA stated that he knew the individual who had taken the SUBJECT VEHICLE had placed something illegal inside. ESPINOZA said that he was not given a location for the delivery, but was told to drive to Los Angeles and that a location would be provided when he got closer to Los Angeles. ESPINOZA expected to earn $3,000-4,000 dollars for delivering the contents of the vehicle to Los Angeles.

25. SA Aguilar asked ESPINOZA for consent to search ESPINOZA's cell phone. ESPINOZA agreed and signed a consent to search form. SA Aguilar searched the phone and found communications on WhatsApp with a contact identified as Louie that seemed to be discussing a drug transaction.

### IV. CONCLUSION

18. For all the reasons described above, there is probable cause to believe that ESPINOZA has committed a violation of Title 21, United States Code Sections 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

          /s/ Troy H Baginski
Troy H Baginski
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this <u>2nd</u> day of April, 2025.

_Karen E. Scott_
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE